May begin. Good morning, your honors. May it please the court, my name is Rachel McDaniel, pro bono counsel for Melvin E. and Meyers, here representing petitioner Mr. Jose Luis Ramirez Mejia. At this time I would like to attempt to reserve three minutes for rebuttal. All right, watch your clock. When the BIA received and reviewed Mr. Mejia's appeal, it should have made findings on four different topics. Whether Mr. Mejia's life or liberty would be threatened because of his protected status, whether he would likely meet that harm if removed, whether the abusive practices and conditions of the Mexican mental health institutions constitute torture, and again, whether Mr. Mejia would likely be tortured if removed. Instead, the BIA ignored the four of the findings, and one of these findings was issued under an improper standard of review. Because of this, Mr. Mejia requests that the matter be reversed and remanded so that the BIA can properly make the four aforementioned findings. How does the BIA apply the wrong standard of review? It says we reviewed the totality of the circumstance, I'm paraphrasing, and we know that we're reviewing for clear error, and we see clear error because that finding, implicit finding, was not supported by the record. So how is that de novo versus a proper application of clear error review? You're correct, Your Honor, in that the BIA does explicitly state that they're applying clear error, but the case Rodriguez v. Holder says that the Ninth Circuit doesn't, it does not matter that the BIA invokes the clear error standard. We have to review it independently and decide whether the BIA faithfully employed the standard. And when we look at their decision, we see that this could not be the case because they found, they disregarded the immigration judge's findings. That was clearly supported in the record, and instead substituted its own findings that went and cherry-picked something that wasn't even at issue, it wasn't briefed by either parties, it was never considered, and instead found and decided against Mr. Mejia on that basis. And for them to go in and do their own expedition into the facts, that's an improper application of clear error, and instead it's de novo. So what does the BIA do in an instance where it affirmed the decision of the IJ? Right? So now in affirmance, this will be on an alternative basis, but the IJ said that he would have denied withholding removal anyway because the petitioner didn't meet the likelihood standard. So if the BIA remanded, it would be for what? If the BIA affirmed the decision of the immigration judge, then we would have been, then we would have appealed again on the basis of likelihood. We would have argued that this was a, this was an error on behalf of the BIA to find against my client on likelihood, but that's not what the BIA did, and we can't even argue that now because they ignored that analysis altogether. Can the BIA ever affirm on other grounds than what the IJ did? They can, but they should, withholding removal analysis is at least two-part, and they need to find, they need to find, like I said in the intro, whether this harm would happen because of the alien's protected status or whether, or and whether the alien would likely meet that harm. And so the BIA could have said, we agree that the likelihood standard was not met here, but we also find that, you know, the motive requirement wasn't met here, but that's not what they did. Instead, they ignored the likelihood analysis, and now we don't even know what the decision was on that matter, and we can't bring it before you here today and make that argument. And that's why it must be remanded back to the BIA so that they make these findings, these requisite findings. So we already went into the clear error standard of review. Also on the topic of withholding removal, the finding that the BIA did make was an error also. They found that the record had no evidence of a motive for the abuses that Mr. Mejia would suffer if he were sent to the Mexican mental health institution. But this is confusing, a little bit illogical, and the BIA never really explains what they mean by a motive, but the case law is clear here. Even the case that the BIA cites itself, the matter of NM, it lays out that the motive requirement is a but-for standard. It's, you know, whether the alien would meet this For the BIA to find that the harm that Mr. Mejia would meet in a Mexican mental health institution would not be because of his status as a man with serious and chronic mental health issues, it doesn't really make that much sense. It's a tautological argument for me to stand here and say that Mr. Mejia would meet this harm in the Mexican mental health institution because he's a, he's a, he would be a patient, he's a man suffering from mental health issues. And does that assume that, so it seems as though in the United States he's receiving, I guess the medical reports show that he's been diagnosed with these serious mental illnesses and he's been on medication and able to function. Is there testimony or an if he were deported to Mexico, he would no longer have access to that kind of treatment because Mexico puts mentally ill people into these mental institutions? Yes, the record shows that there's basically no alternative for individuals with serious mental health issues but to go to these mental health facilities. There are no resources in general hospitals or in the community. And, and whether, you know, Mr. Mejia would receive this treatment is, is not really the issue here. It's whether he would be mistreated, not the lack of, the respondent's briefs tries to mention this as a lack of proper care, but that's that's not the issue here. And what, what would be relevant if we were able to argue the likelihoods, the likelihood analysis would be, you know, whether if he didn't get, if he can't get his treatment outside of these Mexican mental health facilities, then he will be off of his medication. He'll be, he would act out and he would come to the attention of authorities. But it is true that he wouldn't have the same type of treatment available to him as, as is the case. On the CAT claim, Viegas is a very difficult case for you and a petitioner's going to have to effectively distinguish that. How do you get from what is indisputably deplorable conditions within these institutions to the specific intent that's required by the regulations? Right. So, Viegas, I think we can distinguish it on a couple of, in a couple of ways. First, the holding does focus more on the deplorable conditions as opposed to the affirmative abuses that are ongoing and have been clearly documented and continued, such as the, the widespread practice of physical restraints, the abuses of psychotropic drugs and, you know, forced lobotomies. That's not really directly addressed in the holding of Viegas. They say conditions are bad, but this is, this is something that the government thinks that they're going to work on. So that's one thing we want to focus on is the affirmative, intentional abuses that... Well, that's what I'm trying to tease apart and really understand your argument. There's, there's a couple of issues that I see here. One is the type of harm that could rise to the level where it constitute torture, things that you had mentioned, forced lobotomies, being tied down for extended periods of time. How do you go from that to specific intent to inflict harm and pain and suffering? Right. So these are willful acts. I believe the willful acts show that you have to have some intent for this to happen. You can't negligently tie someone to, physically restrain someone to their bed or wheelchair for days on end. You can't negligently lobotomize someone. So that's one way that you get there. And another way is, is through the proof that, you know, the Mexican officials have been on notice. This DRI report from 2000 reported all of these atrocities. They said they would address them. They haven't addressed them. Ten years later, it's been over 10 years, and the same abuses have been documented to be occurring at basically the same rate. So we know that, and I know this is a concept in criminal law, that intent can be inferred when the actor knows that... But wait a second. I think you're confusing something. It's not...Villegas holds there has to be specific intent to torture, but if the torture is going to be performed by a private party, you show that the private party has the specific intent, and the government acquiesces in the practice. I think Judge Hall is pretty clear in separating out those two. It's just who is supposed to have the intent. The torturer has to have a specific intent to torture. Sometimes the torturer is the government. Sometimes the torturer is the private party. And then, if it is a private party, then you have to show government acquiescence. And I think the issue we have to decide about Villegas is, since you could read from this record, nothing's changed since Villegas, and these private mental institutions are still torturing mentally ill people, we have to ask, has the government acquiesced in the practice, which was, what, 2008, and it's now 2016. Isn't that the correct analysis? I think... So the analysis is more accurate. This is actually public actors. This doesn't deal with private actors, because we're dealing with the public institutions, like the public Mexican government. You're saying these are the government institutions. Okay. So then the government institutions are acting through their own employees. That's correct. And then you have to show that the employees have the intent, and the government acquiesces. I think that just showing that the employees are government actors, and if the employees, we can demonstrate specific intent on behalf of the employees, then that's enough. We don't have to show that the whole... Your argument is that they're officials. They're acting through the state, because individuals who are institutionalized become wards of the state. Yes. And I see that I'm almost running out of my time. Good morning. Jane Schaffner for the respondent. Petitioner has a difficult burden in this case. First, as an applicant for withholding of removal in CAT, he must prove that it is more likely than not that he would be tortured, that he would be persecuted or tortured on account of a specific intent of the government for purposes of CAT. He must prove that that is more likely than not to occur, and to prevail on his petition for review, he must show not just that the evidence supports a contrary conclusion, but the evidence compels a contrary conclusion. And there is ample record evidence that the government can torture mentally ill individuals who are in public mental health facilities. Well, that's what I was trying to get at. Is there when, if it's government officials who are running these hospitals and, you know, tying down mentally ill people to wheelchairs for most of the time, performing lobotomies, having all of these, doing all of these terrible things to people, and they're acting in their, as an employee of the Mexican government, how can you not say that they're acting without specific intent and it's the government's intent? Because if the government didn't intend it, it could clean it up, and it's had eight years to do so, and it hasn't. Well, here, as in Viegas, there's no question the conditions are terrible. It's important to note that the DRI report, the Disability Rights International report upon which Petitioner heavily relies, is from 2010. We also have a 2013 country report, which makes reference to more recent Disability Rights International reports that are not in the record. But going back to that 2010 report from Disability Rights International, they specifically note, at page 492 of the record, that the purpose of their report is not to place blame on any individual working in these public institutions. They say these people are working under extraordinarily difficult conditions. There are limited resources allocated to mental health care in Mexico, and what resources are available have been mismanaged. In the years since the 2000 report, there have been changes, as reflected in the 2010 report and the 2013 report. The DRI in 2010 called out Mexico as an international leader in advancing the rights of people with disabilities at the UN. It noted that new facilities, at page 488 of the record, new facilities have been constructed by the government that are greatly improved than the previous facilities. Pages 522- This is all in the 2013 State Department report? I'm sorry, this is in the 2010 DRI report, which does show that some conditions have persisted, but other conditions have improved significantly. New facilities, page 488. 489, as I mentioned, sponsoring the convention for the rights of people with disabilities in the UN. Page 522-25 of the DRI, the report talks about the Hidalgo model, a model that is moving away from institution-based care to community-based care, and that's where we pick up the 2013 report, where the State Department reports that the Mexican government- We can't consider the 2013 report. Oh, it's in the record. It's in the record? At page 383. I thought you said it wasn't in the record. I'm sorry, the 2013 State Department report, the excerpt I'm referring to is at the recent Disability Rights International report, something that's more recent than the 2010 report that's in the record. A more recent 2010, a more recent DRI report is referenced in the 2013 State Department report, and in this, in the State Department report for 2013, which is in the record, at page 383, it says DRI has noted positive signs in Mexico that the country is moving from an institution-based system to a community-based system of mental health care. That's at page 383 of the record. And that's even if, as of September 2013, changes really haven't been implemented? There are reports that the government made promises that it would allow independent review of its mental health facilities, but that is true. As of 2013, those changes had not been made. I'd also like to point out that all of this analysis is focused on public institutions in Mexico. There are also private mental health facilities in Mexico. That's in the DRI at page? Is there any likelihood Mr. Mejia would go to a private institution? We don't know. We know that during his hearing at page 265 of the record, he said he simply didn't know whether he would be able to get his medication. And he also said he didn't know if there was anyone who could help him pay for his meds. Again, his burden is to show that it is more likely than not the government intends to harm him upon his return to Mexico, and he's simply been unable to handle that very high burden. Let me ask you, as far as that intent to harm and looking at the 2013 State Department report and the 2010 DRI report, the immigration judge didn't really go into those as far as making decisions regarding CAT and the withholding of removal. Correct. So the BIA did, and now we're looking at the BIA's determination based on a statement in DICTA by the immigration judge that wasn't even explained in that opinion. What do we do with that? Right. So the IJ in DICTA said he would be inclined to grant because there would be a more than 10 percent, an at least 10 percent chance that this individual would come to the authorities, to come to the attention of the authorities. He said that he hadn't met the hire more likely than not. Right. But as a question of fact, and this is what troubles me about the BIA opinion, the IJ did make a finding. He said the court does find sufficient evidence to show that there has been official condonement of human rights violation in the mental health system. That's a finding of fact. And did the BIA say that was clear error? Yes. Based on what? That there is no support in the record for the conclusion that the Mexican government has any motive to harm Mr. Ramirez. That there is support in the record, and the IJ did make that finding based on the support in the record. Well, in fact, as even petitioner concedes at page five of their reply brief, neither the State Department nor the DRI ascribed any motive to the government. In fact, at page 492 of the record, the DRI specifically said they did not intend to place any blame on the government. The board can reverse a factual finding for clear error when it is illogical or implausible, and without support in the references that may be drawn in the record. It's illogical and implausible that a country that the DRI calls out as a leader in advancing the rights of the people, in advancing the rights of people with disabilities, that that very same country would intentionally persecute or torture mentally ill patients in its care. Isn't the DRI in that report saying, hey, here's what we've observed, but we're not trying to cast blame on anyone. Does that really mean that there's a finding or evidence or not evidence as to whether or not there's an intent or a but for type of relation between what's actually happening in these institutions that, but for the fact that those individuals are there, they're receiving this type of treatment that's very troubling. There's no question that the treatment is troubling. It was troubling in Vegas. Improvements have been made. Some conditions persist, but in Vegas the court found, this court found that there was no specific intent on the part of the government to torture people in its care, that limited resources mismanagement did not amount to a specific intent to harm or torture. To go back to withholding that with the, the BIA said is that there's implicit in the IJ's determination that there has been official condonement of human rights violation in the Mexican mental health system. It says implicit in that, which informed both asylum and withholding, we're not in cat, is a finding that such harm is motivated by membership in particular social group events. And that just seems totally illogical because the motivation is that they're mentally ill. So they're put in the, the institutions and the particular social group advanced is the group of mentally ill people. That just seems illogical to me with, with all due respect, that logic comes directly from one of this court's cases. It's a case called Mendoza. That doesn't really tell me necessarily logical that, that this court concluded that there was no basis to conclude that a group that members of a particular social group. And again, in Mendoza that was an individual who had both diabetes and mental health issues. So made very similar claims to the claims that are before this court. The court ultimately rejected his particular social group claim, but said that even if he were a member of that, it was just a challenge to the general, the adequacy of the general healthcare system in Mexico or wherever the country was. It was a challenge to the general healthcare. In fact, most of the cases in your brief are to the adequacy of general healthcare. Well, and Mendoza, it was also mental health facilities. He suffered from mental health problems and that, and in that case, the court concluded that even if he were a member of a particular social group, there was no evidence that he would be intentionally targeted. This substandard care would be intentionally targeted toward mentally ill individuals or individuals with diabetes or other issues. And there are a long line of cases from other circuits. The eighth circuit in Raffington said limited resources, which is the case here. It's not an intentional harm, but that's the inadequate. This isn't, this isn't a limited resource case. This is that, that those cases are the inadequate health system cases, which you could argue are in every country. And, you know, everybody has limited healthcare resources. This is a particular practice of putting mentally ill putting the mentally ill into a place where their cares are not only not going to be helped, but the main goal seems to be subduing them at any cost because they might be acting out, which is harming them. We disagree. One, that this is a limited resources case. The fact that some of these things occur is precisely because there are limited resources. There is not enough money. Well, what about the lobotomy staff? That's, you're spending a lot of money when you give someone a lobotomy. I, there's been no specific claim here that he will be subjected to a lobotomy. Again, we don't have a likelihood of harm analysis to work with here, but at 231, 291, 296 of the record, the alien indicated that he intended fully intended to comply with his medication. We simply don't know. He himself at 265 simply said he doesn't know whether the medication is available. He doesn't know. Isn't that a different issue than what the BIA found? The ultimate burden is whether he can meet his burden of showing he will be tortured. We don't know what will happen to him upon his return. We do know that the record. Or in withholding more likely than not that he, that he would be persecuted more likely than not. We don't know because he doesn't know whether his medications were available. He doesn't know whether people can help him. He cannot therefore meet the more likely than not standard. And I see my time is short, but I'd like to remind the court again that the evidence in this case may support a contrary conclusion, but this court is tasked with determining whether the record compels a contrary conclusion and judicial deference is a specially appropriate in cases like this one in the immigration context where decisions implicate sensitive questions of foreign relations. The state department has made no determination. I knew this was lurking in the back of this decision because this decision is faulty on a number of levels. And I'm glad you raised the elephant in the room. I mean, this is the kind of case where if we, if, if we say go a particular way in a not in a less than very careful way, it could be seen as the United States come commenting disfavorably on the Mexican government and its use of its resources. And that could create foreign policy problems and issues. But I don't see a statement of interest by the state department here. And normally if that is, you know, if that's something we should be considering, we would have a statement from the state department. So I don't see that. So if you're arguing political question, which I mean, I can see lurking in the background political question or international comedy or other issues here, but we'd have to have something a lot more than this is lurking in the Can I tell you just quickly that all asylum applications are forwarded to the state department for comment as a standard practice, the state department relies on their 20 on their country reports. We have the 2013 country report in the record here. There is no indication in the 2013 state department country report that Mexico intentionally. No, that's not, that's not what I'm talking about. I'm talking about this. It's a separate thing. They would have filed something. They fought, they file something with us to say, you know, your decision will implicate foreign policy relationships with Mexico. What they filed in this case is their country report. They didn't file their country report in this case of country report is done for every country and is background material and resources. It's not done for a specific case. And you know that. So I'm not going to argue my time is up. If there are no further questions, I would ask that you find that the record does not compel a conclusion contrary to that reached by the agency. All right. Thank you very much. Hello again. So first I want to emphasize that likelihood. The respondent really tried to emphasize on the likelihood analysis, but that analysis is not at issue here, and that's one of the primary reasons why this must be remanded to the BIA so that they can find on likelihood. Second, the characterization of Mexico as a leader in mental health reform is misleading. In fact, the primary finding of the DRA report is that after this 10-year follow-up investigation, almost no change has taken place in Mexico's mental health system, and the government's promises of reform have not been fulfilled. So we cannot lean, we can't cherry pick some of the good parts of the DIA report to try to characterize Mexico as this great country that's leading the charge on mental health reform. And third, I really want to go back to Villegas and distinguish that from this present case. As we said, there are affirmative abuses and practices ongoing, documented as ongoing at these institutions over the course of 10 years, probably over 10 years. And these have to be, these officials working, employed by the government, are willfully acting when they do these intentional practices and abuses like lobotomies and physical restraints. There is our specific intent. That's what we have. And furthermore, there's another distinction from Villegas in that Villegas didn't have a record of Mexico's failure to improve. Villegas only had the initial DIA report that said, this is bad, and statements from Mexico that's, again, not actual actions, not any evidence of real impact, just statements and empty promises that they would change. It's clear now this record has, this record, which is distinct from Villegas, has evidence that there has been no change. There's no improvement. And because of that, this does compel a conclusion contrary to what the BIA found, and that there was specific intent to harm. And that there is specific intent to exact these practices that amount to torture. Yes. I was trying to say that. Oh, okay. That's what that means. Thank you, Your Honors. We request that the decision be remanded, reversed and remanded for consideration by the BIA. All right. Thank you. And I want to thank Ms. McDaniel and Mr. Reynolds and Old Melbourne and Myers for representing Mr. Mieja Pro Bono. The Court appreciates your help and excellent briefing. This session of the Court is adjourned for today.
judges: Wardlaw, Nguyen, Zipps